**In re R.O.A.M., INC., dba Reno Joe's, Debtor.**

**Johnny A. RIBEIRO, Jr., Plaintiff,**

**v.**

**R.O.A.M., INC., dba Reno Joe's, Defendant.**

**Bankruptcy No. 80–00844. Adv. No. 81–0006.**

United States Bankruptcy Court, D. Nevada.

Nov. 4, 1981.

Walther, Key, Maupin, Oats, Cox, Lee & Klaich by Keith L. Lee, Reno, Nev., for plaintiff.

Chubb & Silverman by Janet L. Chubb, Sparks, Nev., for defendant.

## OPINION AND DECISION

BERT M. GOLDWATER, Bankruptcy Judge.

This is an action by a landlord to vacate the automatic stay or, in the alternative, for assumption of a sublease covering the foyer of a restaurant and payment of rent. The defendant-debtor has counterclaimed for damages against the landlord-plaintiff arising out of the restaurant lease between the same parties.

Plaintiff (Ribeiro) and defendant (Joe's) entered into a sublease for a restaurant on April 5, 1979.[1] The lease contract provided for the construction of a restaurant building and parking on the leased premises.

For the first five lease years, rent of the restaurant area was at a base monthly sum of $1,838 for the land plus a building rental percentage applied to the "cost of construction" not exceeding $520,000. Until April 30, 1980, this was to be $\frac{1}{12}$ per month computed upon the interim construction loan which was committed at $13\frac{1}{2}\%$ interest plus 1% making the rental $1\frac{5}{24}$ per month times the loan. From May 1, 1980 through the end of the construction loan period, this was to be 1% plus the rate of interest in effect on the construction loan on that date. For the period from the end of the construction loan period through the end of the fifth lease year, the parties contemplated a new loan called a "permanent loan" on which monthly rental was to be computed on $520,000 at the rate of interest obtained plus 2%.[2] The lessee was granted thirty days to secure a more advantageous loan for the landlord, else the loan proposed by the landlord would be accepted by the lessor.

On May 15, 1979, Ribeiro and Joe's formed a partnership, R–T Enterprises (R–T). The partnership subleased from Ribeiro an area of the restaurant lobby for the purpose of operating a slot machine concession. The rental was $1,838 per month which was 1% of the land value of $183,000 for the entire parcel of land owned by Ribeiro and Arroyo.[3] The partnership agreement provided that Ribeiro had an option to withdraw, in which event Joe's was to purchase his interest at a price to be determined by the terms of the agreement. An initial contribution of $10,000 was to be made and the parties agreed on a percentage of contribution and partnership profits, 75% to Ribeiro and 25% to Joe's.

1. Plaintiff and one Joseph F. Arroyo are owners of the land. Plaintiff holds the master lease as sole tenant from himself and Arroyo.

2. Computations for the effective rate of interest included adjustment for interest on fees and costs payable by the borrower.

3. Ribeiro and Arroyo agreed on $8.00 per square foot value for 45,950 square feet or $367,600, one half of which would be $183,800.

The partnership applied for a gambling license in December 1979. The parties agreed June 29, 1979 to an amendment of the slot machine concession sublease that, in the event a gambling license was *not* approved, the restaurant lease would be deemed amended so as to increase the base rent in the latter lease from $1,838 to $2,297.50 the first year and additional amounts each year until the rent reached $3,676 (2 × $1,838) in the fourth year of the restaurant lease. A gambling license was received in January 1980[4] and the slot machine concession was operated in the restaurant foyer with a lease of the slot machines from Bally Company. Each partner contributed the required percentage of expense for coins, license fees, and incidental expenses. On August 21, 1980, Ribeiro demanded from Joe's its contribution to the capital of the partnership of R–T to enable the partnership to pay its rent obligations (Exhibit CC). The partnership agreement provided that failure to make the contribution gave rise to a right of the other partner to purchase the partnership interest of the defaulting partner and if not purchased the partnership would be dissolved.

Ribeiro gave notice of withdrawal from R–T to be effective October 31, 1980, but the partnership had been dissolved by failure of Joe's to make its contribution and Ribeiro to purchase its interest. The slot machines remained on the premises until April 1981. Bally applied all income from the slot machines on its rental agreement. No profit remained for the partners. No rent was paid to Ribeiro on the slot machine sublease but, until the machines were removed by Bally, jackpots were shared 75/25 between Ribeiro and Joe's in the event the jackpot amount to be paid a winner exceeded the mechanical payout of coin in the machine.[5]

The parties assumed the slot machine concession would be profitable and Ribeiro would receive rent. No provision was made for rent in the event of dissolution or un-

profitable operation. Joe's contends there was no partnership because the requested capital contribution was not made and Ribeiro's interest was not purchased, thereby liquidating and dissolving the partnership pursuant to the partnership agreement.

In its counterclaim Joe's seeks damages for breach of the restaurant lease because (1) failure of the landlord to repair defective construction and installation of mechanical air conditioning and heating, (2) for harassment and interference with the tenant's business, (3) for adjustment of rent, and (4) for an injunction against further interference.

## THE R–T PARTNERSHIP

The partnership commenced upon receipt of a gambling license in January 1980 with installation of slot machines in February. On August 21, 1980, Ribeiro, by his attorney Maupin, demanded Joe's contribution, stating Joe's was liable for 25% of the expenses, rent to Ribeiro being the major share. When Joe's failed to make the contribution as demanded, Ribeiro did not purchase Joe's interest and the partnership was dissolved by its terms. It continued to wind up or "down" until the slot machines were removed by Bally in April 1981.

On Ribeiro's complaint for damages:

1. Ribeiro's attempt to withdraw in October 1980 was at a time when the partnership was already dissolved and winding up. Thus, the rent for R–T to Ribeiro is $1,838 per month from September 1979 until rejection of the lease in May 1981 of which 25% is a claim of Ribeiro against Joe's for $9,649.50. In addition, rejection of the lease entitles Ribeiro to a claim for damages in the amount of rent reserved by the lease for one year from the date of surrender (25% × $1,838 × 12) or the sum of $5,514 pursuant to 11 U.S.C. § 502(b)(7)(A).

2. Ribeiro is entitled to the return of possession of the area reserved in the slot machine sublease because of the rejection and surrender of R–T in May 1981.

---

4. Thus rendering the amendment to the sublease moot because there was no alternative provided if the license was granted.

5. Joe's paid the cash required and was reimbursed 75% by Ribeiro.

## THE COUNTERCLAIMS

### I. Breach of contract for construction of restaurant under lease

█ Ribeiro constructed the restaurant with a heating and air conditioning system which did not function satisfactorily for fifteen months. Joe's complained constantly from the spring of 1980 until the system was properly repaired in May 1981. The problem involved an imbalance in the system and the failure of mechanical operation due to miswiring which caused malfunction. In turn, because Ribeiro had ordered but refused to pay a subcontractor for necessary work required by the Reno building code of installing pans under sewer lines in basement areas where food was handled, the subcontractor refused for some time in 1980 to perform *any* warranty work on the system.

The malfunction of the heating and air conditioning system caused the thermostats to receive hot and cold air and to use excessive amounts of electrical power. Expert testimony of a power company engineer was that there was expense for heating and cooling which varied on a monthly basis considering factors of outdoor weather temperature. No precise dollar amount could be determined but it was apparent that subsequent electrical energy bills after Ribeiro had attended to the required repairs compared with the fifteen month problem period showed a difference of at least $1,000 per month. In addition, there was a loss of business because of the unbearably warm temperature in the bar and restaurant during the summer of 1980 for a period of two weeks. Joe's spent $2,292.60 (Exhibit GG) for repairs which were entirely the responsibility of Ribeiro under the lease because motors were not protected from changes of electric line flow in the phases of the motor. Joe's also paid $758.13 (Exhibits EE and FF) for adjustments which were Ribeiro's obligation.

Joe's is entitled to its out-of-pocket expense of $3,050.73 plus damages for excessive electrical expense of $15,000.

### II. Business Interference

Ribeiro harassed the owners of Joe's unmercifully. He complained about the appearance of the yard without good reason. He expressed his unhappiness with his bargain on the lease and stated he would like to have the building returned so that he could convert it into an office building. The Thomases, who are the principals of Joe's, have been met with rumors emanating from Ribeiro that they are not paying their bills. Ribeiro deliberately denied Joe's twenty-one parking places by fencing the area so that it could not be used. Patrons were seen coming in but driving away for lack of parking. He deliberately refused to pay a subcontractor's bill which was rightfully his obligation causing the subcontractor to refuse to service the warranty on the air conditioning. This type of conduct not only interfered with Joe's business but also caused personal irritation and physical and mental illness to the owners.[6]

█ Damages for business interference is a well-settled rule of law. The right to carry on a lawful business is a property right and interference without just cause or excuse is ground for the award of damages and injunction. *Guion v. Terra Marketing of Nevada*, 90 Nev. 237, 523 P.2d 847 (1974). *See also Fireman's Fund Insurance Co. v. Shawcross*, 84 Nev. 446, 442 P.2d 907 (1968).

█ However, compensatory damages for loss of business profits may only be awarded where there is some history of business activity from which it may be determined what loss of income resulted. Here there was little or no business history as the lessee was just getting underway. Compensatory damages in the form of lost profits are therefore incapable of determination. In *Knier v. Azores Construction Co.*, 78 Nev. 20, 368 P.2d 673, 675 (1962), the court said:

Where the loss of anticipated profits is claimed as an element of damages, the business claimed to have been interrupted must be an established one and it must be shown that it has been successfully con-

6. Mr. and Mrs. Thomas are not parties to this action seeking personal injury damages.

ducted for such a length of time and has such a trade established that the profits therefrom are reasonably ascertainable.

Nevertheless, there is sufficient showing for actual general compensatory damages of $1,000 considering that the lessee was put to a running battle with Ribeiro that took time and money to recover parking, repair building deficiencies, meet unfounded charges, and remain in business in spite of the interference from Ribeiro.

 Punitive damages are authorized in a proper case to punish and deter culpable conduct. N.R.S. 42.010. The amount lies in the discretion of the Court and need bear no fixed relationship to compensatory damages. In *Alper v. Western Motels, Inc.*, 84 Nev. 472, 443 P.2d 557 (1968), where compensatory damages of $96 awarded by the lower court were increased by an additional $75, it was held that $1,500 punitive damages were not disproportionate and no particular proportion is required. The Nevada court cited with approval *Finney v. Lockhart*, 35 Cal.2d 161, 217 P.2d 19 (1950) which allowed $2,000 punitive damages as against $1 of compensatory. *See also Midwest Supply, Inc., v. Waters*, 89 Nev. 210, 510 P.2d 876 (1973), (an award of $100,000 punitive damages was not erroneous even though it exceeded the prayer of the original complaint). In *Waters*, the court held there need be no fixed relationship to compensatory damages, the amount of which was not stated in the decision.[7]

 Ribeiro's conduct was oppressive and constituted an intentional interference with business. Ribeiro filed suits for rent or recovery of the premises within a short time of a default. He showed no compassion and no interest in the success of the

tenant. He did not testify and there is no contrary evidence. Joe's is entitled to punitive damages which will punish Ribeiro. N.R.S. 42.010. Punitive damages are fixed at $20,000.[8]

III. Lease Agreement on Rent

Defendant contends that a "permanent loan" has not been made because it is only a five-year loan and that the terms of the original construction loan should be used to compute rent of the restaurant until there is a permanent loan. The broker who attempted to obtain a long-term loan testified that (1) it was at a time in 1979 when interest rates were rising and no bank or institution wished to commit itself for a long-term loan, (2) that the building is built for a restaurant which does adapt to any other use without a great expense and is not an attractive security, and (3) the restaurant business is notably a very risky business.

The rent issue depends upon the meaning of "permanent loan". The lease is for a period of twenty-five years with three ten-year consecutive options. The precise terms of the five-year loan with Nevada National Bank was not established.[9] Testimony was that it was "negotiable" at the end of the five-year term but the bank would not be bound for any longer term unless there was a new agreement between borrower and lender. Thus, the inference is that the interest is fixed for the first five years but the loan is not intended to be "permanent" in the sense that the cost of construction is to be amortized over the five-year life of the loan.

The sublease states: (Paragraph III.B. 3.a.)

7. Generally the absence of any compensatory damages will bar an award of punitive damages. *See Alex Novack & Sons v. Hoppin*, 77 Nev. 33, 359 P.2d 390 (1961); *City of Reno v. Silver State Flying Service, Inc.*, 84 Nev. 170, 438 P.2d 257 (1968).

8. There was no proof of Ribeiro's financial condition but there was evidence of his willingness at one time in 1979 to personally finance the building ($600,000 cost), that he had made 100

substantial loans from banks and other institutions, employs a full-time C.P.A., and enjoys the ownership of much property and a construction company.

9. Exhibit C, a letter from Ribeiro's attorney Maupin to debtor-defendant and its attorney Fahrenkopf under date of April 22, 1980 refers to a "copy of the loan commitment letter dated April 21, 1980" for a loan of $640,000.

Following the execution of this Restaurant Lease, Lessor shall submit to whatever lending institutions are selected by Lessor, in Lessor's discretion, applications for a *new loan* (hereafter referred to as the "permanent loan" to be secured by Lessor's interest in the premises. (Emphasis added.)

The parties thus defined permanent loan to mean the next succeeding or *new loan* after the construction loan. Hence, while the loan is not permanent in the sense of final, it is the permanent loan by definition in the sublease for the purpose of fixing the rental to commence with the calendar month in which the permanent loan is disbursed. (Para. III.B.2.)

Joe's contends that the rate of interest should be 14%, because on November 15, 1979, Ribeiro's counsel wrote the Thomases' counsel: "If the proposal for Johnny to carry the permanent financing himself at 14% interest is unacceptable to the Thomases, then the construction loan with Nevada National Bank will be converted to a permanent three-year loan. Under the terms of the loan with the Nevada National Bank, the interest rate is 2% above the floating prime rate of interest. Based upon the current prime rate of interest, the rate of rent under the restaurant lease would be approximately 18% from May 1, 1980, until a more satisfactory permanent loan is obtained."

No reply was made to this offer. Thomases' then counsel believed that the proposal was a standing offer.[10] Not having received an acceptance, Ribeiro on April 21, 1980 notified the Thomases that he was obtaining a commitment from Nevada National Bank and that they would have thirty days to obtain a more favorable commitment pursuant to the terms of the lease. The Thomases were unable to obtain more favorable terms.

An offer not accepted expires within a reasonable time. Mere silence does not constitute an acceptance. *Milner*

*v. Dudrey*, 77 Nev. 256, 362 P.2d 439 (1961) holds that there must be a decision to an offer communicated within the period of an option. Where there is no fixed period the offer may be revoked at any time before acceptance. *McCone v. Eccles*, 42 Nev. 451, 181 P. 134 (1919).

Hence, it is clear that (1) a new loan called "permanent loan" has been made as agreed by the parties to the lease, (2) such loan terms were offered to Joe's for thirty days to give Joe's an opportunity to find a more favorable permanent loan, (3) Ribeiro's offer in Maupin's letter of November 15, 1979 to finance at 14% was never accepted, and (4) the rent as defined in the sublease of the restaurant commencing May 1, 1980 remains in full force and effect under the new loan called a "permanent loan" as agreed.

Let judgment be entered as follows:

1. Ribeiro is awarded (a) the return of possession of the property area under the R-T sublease and (b) damages in the sum of $9,649.50 plus $5,114.

2. Debtor-defendant is awarded general damages for breach of contract of the lease construction of $18,050.73.

3. Debtor-defendant is awarded damages for business interference of $1,000, general damages and punitive damages of $20,000.

4. The rent remains at the amount defined in the lease commencing May 1, 1980 under the new loan as a permanent loan.

---

**10.** See Defendant's Exhibits B, C, and D. Letters from Maupin to Fahrenkopf of November 15, 1979, April 22, 1980, and April 28, 1980.